Anthony&Sylvan v. Anthony&Sylvan Good morning. Good morning. My name is Michael Trackman, and I'm here to represent the appellant Ray Calvitti. Thank you for this opportunity. I reserve two minutes for rebuttal. Your Honors, as you know, this is an appeal of a motion to dismiss pursuant to a 12B6 motion. I think you'd better move the, either move yourself or move the mic so we hear you. Closer, I'm sorry. Thank you, Your Honor. This is an appeal from a dismissal of this action based on a 12B6 motion. So we're here to consider the face of the complaint and the exhibits that were attached to the complaint. I think two issues are of particular importance here. Number one, the district court found as a matter of law based on the allegations in the complaint that Mr. Calvitti knowingly waived his rights to the balance and the trust that is the subject of this action. And number two, the district court found that the face of the agreement and release in this case was unambiguous in respect to the effect that it had on the cause of action that Mr. Calvitti raised. I would respectfully suggest to the court that based on the face of the allegations and the attachments to the complaint, one could not conclude as a matter of law the way that the district court concluded in this case. And since your client, a sophisticated businessman, former president of the company, entered into a multi-paragraph release, which expressly released all liability claims. You know, one of those how many synonyms can you throw in for claim kind of release, including expressly an ERISA complaint, I'm left puzzled by that assertion that nobody could have looked at this in a matter of law and saw that somebody says, yeah, I'm relinquishing all my claims, rights, actions, possible things I could ever do from now until kingdom come, including ERISA claims. How is that out of line for district court to look at that and say, sure looks like a release to me? It is a release, your honor, but the question is of whom? The released parties in that release was a defined term, it was the employer. And that defined term employer was defined in a certain way so as not to include the trust that is at issue here. What that employer definition included, for example, was another trust. They knew how to list a trust if they wanted him to release the balance in a trust liquidating. The supplemental plan says under no circumstances are the assets of the trust to be considered part of the assets upon which Mr. Calvitti has a claim. And the trust says exactly the opposite, which is the ambiguity here. Your honor, I can, with your permission, I would cite you to the record in respect to the language of the trust, which says the exact opposite on these points as to what the plan says, which is there's something for everyone in these documents, which is the problem. No one could conclude that read together these documents are consistent and other than contradictory. They're horrible documents. There's no question about that. The trust says, for example, that once the money goes in, it's irrevocable. The trust says that the funds in the trust shall be used exclusively for the plan participant except for claims of creditors. That's at 837 paragraph 1D. The trust says that in the appendix 841 paragraph 4 that except in limited circumstances that don't apply here, and now I'll quote, the company shall have no right or power to direct the trustee, end of quote, to return the funds to the company. The trust says at 846 of the appendix paragraph 12C, the company cannot terminate the trust except upon Calvitti's written approval. So you're absolutely right, your honor, when you say what the plan says. My point is that the trust is an independent and separate entity under the law. And it says something completely different in regards to how the money in its domain is to be handled. Didn't the complaint say that it's, quote, solely as a result of the company's actions that your client, Mr. Calvitti, has been required to commence and pursue this action? That's what the trust attorney said. What are we supposed to make of that language when you say in your complaint, it's only the company's actions that give us any cause for pursuing this? Sir, the reference that's being made are the company's actions, which immediately preceded the complaint, where the company wrote to the trustee and said, don't you dare release this money to Mr. Calvitti under the trust. Up to that point, for 10 years, it's worth noting, because conduct, as this court has held, is the greatest indicator of what the parties believe their obligations to be. If the balance of this trust was released by Mr. Calvitti back in 1996, why then, for example, did the company, however you identify it, A&S, I'll refer to it here as the company, why did they make another contribution into it, which accrued previous to the time of the release? Why did they not take the money? Why did they maintain it? That's a puzzlement. Yeah, but that might have been inconsistent with the release, but it doesn't alter the plain meaning of the release. And what I would suggest to you, Your Honor, is that there are two factors that you need to consider in respect to that, and when you're talking about the plain meaning of the release. Number one, I've already mentioned in respect to Judge Jordan's question... Well, are you claiming the release is ambiguous? Yes. And I'm claiming that based on its own terms and two respects on its face, aside from all of the other factors on the face of this complaint that pertain to the conduct of the parties themselves. But let's look at the language... Well, if you look at the document, the conduct doesn't matter, does it? Understood, and let me address the document itself. Number one is who is released, as I've mentioned to Judge Jordan. If you're going to release the balance in a trust which specifically says, and on the terms of the trust, the balance of the trust says that it's irrevocable, the company has no right to direct the trustee to return this money, the funds are to be used exclusively for CalVity and the company's creditors... I thought you were going to direct this to what on the face of the release. I am, and what I'm... Well, that's on the face of the release. The trust is not a subject matter of the release. That's my point. My point is that the trust has a separate existence. The trustee controls the money pursuant to the terms of the release. When you say the trust is not the subject of the release, doesn't the release specifically make reference to the supplemental plan? It makes reference to the plan, but not the trust. And by making reference to the supplemental plan, doesn't it necessarily include the terms of the supplemental plan? No, it simply identifies the supplemental plan as one of the... as the employer, without identifying the release. The release talks about we're letting go everything that we've got, including any risk of claim we might have under the supplemental plan. Yes, and that relates... Well, if that's what that says, and the supplemental plan says, quote, the assets of the trust shall not under any circumstances be deemed to be an asset of the plan, but at all times shall remain part of the general assets of the company, etc., why would we look at that and say, God, I don't get it. It's all... it's ambiguous to me. Because the trust, once again, Your Honor, says the opposite of that sentence from the plan that you just read, which makes it all the more important that the trust be released. The trust is an... that's where the money is. It's the old John Dillinger, do I have that right? Why did he rob the bank? You have to go after the trust. The trust is where the money is, and once the company, pursuant to the plan... That seems to be a pretty weak argument, because the person who stands to benefit from the trust is giving up a claim, at least a claim as of 1030-95. Wouldn't your better argument be that there is a course of performance that indicates that the parties clearly intended the rights that... or claims to the trust to exist post-1030-95 by virtue of the fact that the trust was never dissolved, that they actually put money into the trust that they were obligated... the corporation did that they were obligated to do prior to 1030-95, and when your client asked for a commutation of the amounts owed to him, which I guess was about $275,000 or so, they said, no, we'll deal with that in due course. Yes, and I was trying to respond to Judge Slover's question about the face of the agreement itself, which you're absolutely right. The conduct of the parties clearly indicated a distinction, and there's two bodies of money here. The plan, Judge Jordan, referred to what this company was obligated to do in the future in terms of making continuing payments, and there's no more clear explanation as to the fact that that's the only thing that the parties chose to release than paragraph 5 in the agreement and release, which says it's agreed that the employer shall have no obligation to make any additional contributions to the trust. Fine. The argument on the other side is that's just redundancy. That's superfluous. But you're still not home free. Well... Because the question then becomes, do you apply to this release, do you apply Pennsylvania law, which allows coarser performance to indicate the party's intent, or do you apply federal law? And if so, if you apply federal law, how do you distinguish our decision in QUIC, which was 2001, QUIC versus NLRB, which is like 245, Fed Third, 240. Well, at the time... Which appears to indicate, at least as past practice, I don't know about coarser performance, that if a contract's unambiguous, you can't add anything. That's not the majority rule. But that's, if that's a holding, at least past practice is not something that can change an unambiguous contract. It's not just past practice, Your Honor. It's the future actions that they took subsequent to signing, which indicated what their true intent was. In respect to this, I think that in terms of general release law, Pennsylvania law applies, and in that, in some respects, ERISA law applies most notably in regards to whether or not Mr. Calvitti can be deemed to have provided a knowing waiver. The release purports to be governed by what law? It doesn't say, I don't believe. It simply says that disputes, any dispute or difference settled in the county of Montgomery in accordance with the rules of the American Arbitration Association, actually, in respect to this. And although the release, the action that was brought was an ERISA action in order to stop, there was no dispute under pursuant to the terms of the release. It was only raised in the defense in the motion here, in the motion proposed by the company. But the district court dismissed the claim against the trust, saying that there was no independent action or basis to go after the trust, right? And that was my understanding of what, quote, a fair reading of the paper submitted on motion before us now indicates the parties agree that no independent claims remain against either the trustee or the trust. That's the district court's order. He interpreted the agreement and release to extend to the trust even though the trust was not named as a released party. Well, I think it's more than that. It seems to be an assertion that there's an agreement by the parties that there's not some independent claim against the trust. That whatever claim you've got is a claim against the company and that you're saying we can, the money's in the trust but the claim is based on something the company did or didn't do. Is that right? That's what the court said but focused only on the language and the plan. The court was wrong in that regard, Your Honor. Is the court right about this, that whether the court, you agree that the court was right to think that that money was off limits to you, was the court correct in understanding your position to be that your claim isn't the claim against the trust, it's a claim against the party that is the company and that the money's in the trust? No. My claim was, again, when I became involved in this case, I filed an amended complaint to name the trust as the defendant in this case. Did you say to your opposing counsel that represents the trust that the only reason for including the trust in trustee was, quote, because the court could not otherwise enforce its judgment, whatever that may be, absent the presence of the entity which holds the funds in question? I'm certain that that's one of the things that I said, was that the entity that has the money and has a separate agreement which defines when my client is entitled to the money, the plan details the obligation to make payments into the trust. Once it's in the trust, the trust takes over. It says it's irrevocable. It says that money can only be used for the benefit of CalVity and creditors. It says the company can't use it for any other purpose. What was meant by the statement that the only reason for bringing the trust in was where the money is? I'm trying to find out what your claim against the trust is. I understand what your claim against the company is. I'm trying to find out what independent cause of action do you have against the trust? Have you disclaimed any in this letter to your opposing counsel? The District Court thinking you didn't have one, what is it that you're saying is your independent claim against the trust? That the trust is an indispensable party by virtue of the fact that it has the money and the court has to order the trustee to release it pursuant to the terms of the trust? So I can see why the District Court was confused because it sounded like you just said to me what you evidently said to the District Court and to opposing counsel, which is your claim against the trust is it's got the money, which is owed to me because of what the company said. No, because of what the trust document says. The trust document defines supposedly in coordination with the plan, but you can't line them up because they say opposite things about the same facts and circumstances. And that's where you have to include parole evidence to figure out what were these parties intending. One says it's the company's money. The other says once it's in the trust, it's irrevocable. It can only be used for Calvity and the creditors.  Under the supplemental plan, it is supposedly held for the trust as a way of holding assets for Mr. Calvity. Does it stem from the supplemental plan? It does to the extent that the plan mandated that the company create a trust, which was done, but then the trust document mandates that the trustee do certain things, which the trustee did not do because the company imposed upon the trustee not to when the trustee said, I'm in the middle. I don't know what to do here. Are you suggesting that the release is somehow invalid or illegal or unenforceable in some respect? No. I am suggesting that the meaning of the release is ambiguous to the extent that it's contended that the release claims against the trust when the trust is not a party. When the release itself says only that the company shall cease making future payments, why would you say that you don't have any obligation to continue to make payments to a trust corpus that you're saying I already own? It makes no sense if you're saying if the release means that the company already owns the trust corpus, why would the only specificity in the agreement or release say the company doesn't have to continue to make payments to the trust corpus that it already owns? That's on the face of the agreement. The only thing that the company can say in response to that is superfluous language. Well, I would suggest that the only way that the court would know whether it was superfluous language is to hear the testimony of the parties as to why do you say, why did the company write, and it's our contention to remember that the only thing released here was what's said in paragraph 5 specifically. No implication. That's the only thing released. The company has no continuing obligation in the future to make payments. But what's there is Calvities. Mr. Trachman. I see the light, Your Honor, in more ways than one. I'm not a potted plant. I have a role. Thank you very much. Thank you. Good morning or afternoon, Your Honors, as the case may be. Just about afternoon. You've been very patient sitting there through all these cases, Mr. Langley. Actually, I think the court has been very patient with all of us. I did hear all of those arguments this morning. All I have to say to you is you ain't heard nothing yet because of what's coming tomorrow and the next day. I know something about that. Be sure to come back. He will. The question, first thing, this was a motion. There was no discovery in this case, was there? Let him put his name on it. I apologize. No, I'm sorry. I know who he is, but you better account for the record. Put it on the record. May it please the court, I am Bill Hangley. With me is Bonnie Hoffman, representing the epily. Okay. Was there any discovery conducted at all here? No. If there was, and you heard me say that there were three things that happened after 1030-95, the agreement says there is no obligation of the company to put any additional funds into the trust. So states unambiguously. And then they afterwards, they did put the monies in that were owed prior to 1030-95. Is that correct? They made a contribution. They put monies in. You put a rabbit in when you said it was owed, but they did put money in. They did put money in. But they perceived, whether it was owed or not, they perceived that it was owed. No. They put money in the trust. The one thing we know, I think, or can fairly say. They put monies in the trust for who? The bank pooled business was a busier and more profitable enterprise back in the day when they put their money in the bank than it is today. That we know. Why somebody in bookkeeping or wherever made a deposit to that trust, along with the other year-end contributions that they make to the various 401Ks and pension plans and other things, I don't know. The record is silent. Are you suggesting it was unauthorized? I am suggesting that it was a mistake. But we don't have a record to support that. However, we could not, through that act, change the unambiguous meaning of the contract because whatever the contract says, it clearly says there's no obligation to pay this money. If you're suggesting that was a mistake, shouldn't there be allowed discovery to determine if you are correct? No, because the agreement itself, clear as glass, says that the obligation doesn't exist. Mr. Calviti, in his own brief, has argued that that obligation didn't exist. In fact, that's one of the crutches of his argument. The fact that somebody may have done something inconsistent with that doesn't change the agreement. What our court has said is that although extrinsic evidence is admissible to show that a written contract, which looks clear, is actually ambiguous, so if that's the case, if it looks clear to you and they're saying it's ambiguous, why can't they at least be allowed to put in evidence to show that that might be the case? Well, they can put in evidence to show that that might be the case. In fact, we agree it was the case. The money was put in that account. Well, then the next thing was within a year, Mr. Calviti asked for a commutation. It was what, about $275,000? He didn't ask for a computation. He said payment. Commutation. Commutation. Commutation, yes. Give me the money that's currently in there. And the general counsel who was involved in the drafting of all the documents, the general counsel said, no, we're going to follow what the plan says, which in effect, if you read through the lines, is you'll get it or there's a possible claim 12 years from now. Well, what he said specifically was we're sticking to the terms of the trust, which of course had not been dissolved yet. Should it have been dissolved? Yeah. Was there anybody else that could benefit from this trust other than? So if it's only Calviti, they kept the trust open, obviously there was a question in their mind, and it would seem that you would grab the money and run as quickly as you could if you thought that that was released as of 10-30-95. Now, again, you may be right. All I'm saying is that at the time of the motion to dismiss, not allowing a party even the chance to have discovery to show that they might be right doesn't seem to mix well. And then you'd look at also why would Calviti get $167,000 on 10-30-95 in order to give up, among other things, a $275,000 claim? Okay. Once again, the settlement agreement and the release very clearly specifies what he's giving them. Two answers to your question, Judge. One, the wisdom of his bargain is not for us. That question of why would you do that is not for us. Secondly, it was a wise bargain because, if you recall, attached to that release is a menu of the criminal claims and related civil claims that the company has with respect to Calviti for what they consider to be the – But that's not in the court of its opinion on 12-A-6. At least should we not have reached summary judgment. I'm sorry. I didn't hear what you said. I didn't hear the rest of it. Excuse me. Go ahead. You didn't finish your answer. Okay. So maybe we could have you finish your answer, and then Judge Bamberg will come in. We know each other too well. Your Honor. What you started to say is attached to the release. Attached to the release is a summary of the claims against Mr. Calviti, which led to his termination, which led to the settlement, and other things. There were issues with respect to the profligate treatment of corporate property, using business assets for the garden variety of things. If that's true, Mr. Hangley, why, when the letter was written to the pool company, at this point I know it was KDI Sylvan, why did Mr. Langner write back and not say, what are you talking about? You got everything you're going to get. You're not getting another nickel. Instead, he writes back a letter that says, please be advised that after careful review, dot, dot, dot, the Board of Directors and Management of Anthony and Sylvan is determined to continue administration of the plan in accordance with its terms. What are we supposed to make of that? You know, what you can make of it, it is a statement that was certainly not called for by the trust and that somebody made. Does it change the agreement? Somebody, the general counsel of the company, right? It was general counsel. Not the present general counsel, but general counsel. Now, I can say to you again, Judge, that what the plan says is not at all inconsistent with what the trust agreement says. Mr. Trachman's argument. Why don't you go ahead and address what I take to be the central argument from Mr. Trachman, which is these things are ambiguous and the ambiguity arises because of discrepancies between what the trust says and what the settlement says. Right. And first let me say that that perceived discrepancy is not a discrepancy that was raised in the trial court, I believe it's worth. But that doesn't really matter because there is no such discrepancy. As we know and as Mr. Trachman has conceded this morning, the plan itself makes indisputable the fact that Calviti never had a claim against the trust. That much he, I, and I believe the court and certainly the court below all agreed upon. I'm not sure he does agree to that. I think I heard him say here today he didn't agree to that. Okay. He, I think he said, but I can show you both. Let me start with the trust because we know that Calviti released the plan from all claims. We know that that's in the release. Did he release the trust? Well, he released the company, the plan, and the agents and specifically the trustees of both of them. So now we're down finally to an inanimate paper entity, a bank account, the trust. Well, that's not true factually, I don't think, but we'll come to that. Why don't you finish with Judge Jordan's question? All right. Let me finish with that and then we'll address yours. In paragraph 1D of the trust agreement, it's in the record at A37, here's the language that Mr. Crackman quoted but only in part. The principle of the trust shall be held, and I'm paraphrasing some words, shall be held separate and apart from other funds of the company and shall be used exclusively for the uses and purposes of the planned participant and general creditors as herein set forth. So there are two purposes. The trust beneficiary can get it, the participant, and the general creditors, except there's then further explanation which explains the hearing. Next sentence. Planned participant and his beneficiary, that's Mr. Calvini and whoever he designates as a beneficiary in the event of his death. Planned participant and his beneficiary shall have no preferred claim on or any beneficial interest in any assets of the trust. Any rights created under the plan and under this trust agreement shall be mere unsecured contractual rights of the planned participant  which is to say he has no interest in the assets of the trust. And this works in a very interesting way. In fact, he had no interest in it or no claim to it until he was 65, correct? Well, no. He had an expectancy, the kind of expectancy. Did he have a claim to it at age 53? He had a claim not yet matured to it at 53. And so doesn't a release release claims that exist as of the date of the release? No. Hold on. It releases. I apologize. Go ahead and finish. There's something I lost. Okay. Go ahead. You go ahead first, Ken. When you say it, I just lost it. I lost the it. Who said it? When you say claim to it, what's the it we're talking about? Are we talking about the assets in the trust when you just said it or are we talking about an obligation to pay a sum as measured by the assets of the trust? I am saying that until he, let me define it. What the company and the plan always had, what the company always had, really, because the company is the entity. What the company always had until he bargained it away was an obligation at a future time, subject to, I guess, a condition subsequent, which would mature when he was 65. The company had that obligation to pay him out, either by causing the trust to pay it out or by paying it out itself. So the it is not the money in the trust. It's a sum of money equivalent to what's in the trust. Is that right or not? With respect to the company, that is exactly right. With respect to the trust, what the language I just read to you said is that he has no beneficial interest in that specific money. Okay. That answers my question. I apologize and please continue with what you're saying. Okay. And if I can move over to your question. So when did the claim accrue that he had to the monies in the trust? The claim was knowable and subject to the future condition of getting to be, page 65, at the time that he signed the release. If that was the case, then why didn't the General Counsel tell him that in August of 1996 when he asked for the commutation? That is a question that I can't answer, but it doesn't change the language of the agreement. Doesn't the question, you can't answer a call for some discovery? No. No, because all that is called for discovery, respectfully, is as to whether the fact that we've already admitted occurred. Let's suppose you took General Counsel's deposition and General Counsel said, geez, you know what? I hadn't really thought it through, but I thought at the time, I thought at the time that this agreement might, in certain circumstances, still entitle him to some sort of a claim. Suppose he had said that. I said here respectfully, sir, that the language of the agreement would still control because there is no ambiguity. The language of the release. And there is no course of performance here. What you got basically is two events that didn't happen. They didn't pay him any money and they didn't acknowledge that he was entitled to the money. But even in the, the agreement means one of two things, the release. Either accrued benefits are released or the release does not cover accrued benefits. You say one thing, he says another thing. Not quite. Not quite? No. Okay. Because it is clear to, I think, Mr. Trackman and me, unless he changes his tune now, that with respect to the company and with respect to the plan and with respect to all the agents and servants and trustees, he is giving up his right to accrued benefits. He's giving up his right to have the company make additional contributions to the plan. That is certainly so. And the word is additional contributions, correct? He's also given up, as Judge Jordan said when he first gave, mentioned the laundry list of synonyms at the beginning of the release, he gave up everything with respect to the company. He gave up everything with respect to the plan, including accrued claims. Including the ability to make additional contributions. Including that, but not limited to that. Including that, but not limited to that. And, sir, if we decided that every redundancy in an agreement, every unnecessary appendage in an agreement caused it to be fatally ambiguous, we wouldn't have any agreements. If you and I agree on what appears to be A, but you and I understand and intend something else, and later it comes that there's a dispute between us, why is it that you and I cannot put in evidence that shows each party's side and then let a court decide that, rather than having a court decide it at a motion to the Supreme Court? The cases cited in my brief, and I believe cited by the court below in its opinion, have pointed out that because the construction of agreements is a question for the court in the first instance, he believed, and I believe he's right, that it would have been a reversible error for him to go beyond the bounds of the unambiguous language. Now, to the extent that there's a question. You'll concede that that's not the majority rule. Pardon me? You'll concede that that's not the majority rule. In the Arisa cases, I believe it is the rule. The Murray case that he cites, which of course is not from the circuit. Does federal law apply here or PA law? Federal law. Because? Because. Release was governed by federal law? Pardon me? Release was governed by federal law? The release with respect to the Arisa claims was governed by federal law. Yes. The court so held. And if you have, if the federal law, at least, the least dicta from our circuit says that if the contract is unambiguous, you can't put in extrinsic evidence of course of performance. Pennsylvania law says the opposite. You could. But what makes this necessarily ambiguous? It's unambiguous. Because it is no longer course of performance. We're not here. And the questions you raised sort of respectfully don't address what the parties did during the life of an agreement between the plan and the board or between the plan and Mr. Calvini. Those rights were terminated by a solemn agreement with consideration. After the agreement was terminated, if certain things that happened because someone out of ignorance thought the agreement might still be in effect, that's not course of performance. Counsel didn't act out of ignorance. He answered the commutation request after, quote, very careful consideration, close quote. With respect to a one-time agreement whose performance was over, the point I'm trying to make to you, Judge Andro, is that this is not course of performance. This is poking around in the ashes. This is post-mortem. This is looking at the agreement's conduct afterwards to indicate what its intent was with respect to a release. Post-contractual performance is not course of performance, respectfully. Excuse me? Post-contract performance is not part of the course of performance of the contract. What support do you have for that? Pardon me? What support do you have for that? The words themselves. The course of the party's performance of an agreement that doesn't exist anymore. If the agreement, well, the release clearly exists anymore. Come on. No, it doesn't. If the release doesn't exist, then you don't. No, no, no. The release exists, but the arrangement, the contractual expectancy and right to the company and the plan, the only act of people, has been given up. That is over. As I pointed out to Judge Joyner in response to your questions, you never had a right with respect to the assets of the trust itself. Well, I'm beating a dead horse, so I'll let you go. Yeah. It seems to me I'll have to remind you, too, that the red light's on. I knew that. Thank you, Your Honor. Thank you. Thank you. Can you just clarify one thing for me, if you would? How much time does he have? Two minutes. Two minutes. Okay. Are you saying, as Mr. Hangley says, that you have released the company with respect to all claims pertaining to the ERISA plan? No. To its future, to its obligation after the release effective date to continue to make payments into the trust that come due thereafter. That, not just what I'm saying, that's precisely what the release says, and that's when it came time for the release to define what's being released. Tell me where, when you say that's precisely. Paragraph 5 of the agreement of release on page 849 of the record. It says, it is agreed that the employer shall have no obligation to make any additional contributions to the trust established pursuant to. That's the only definition in the release document as to what's being released. If it says there's not going to be any obligation to make any additional contribution, and that's given in the litany of things that's being released, how does that support your case? Because if you had already released, if Calvidia had already released the fund, and the fund belonged to the company, why would the company have to parse out and say the only thing, what we're releasing here is the ability, is the obligation to continue to make payments to a fund we already own? The only logical explanation is we don't own that fund. The only thing we're saying here is that we don't continue to make payments until you own it. Isn't there another logical reading of it, which is particularly in the context of a lengthy list of things that are being released, that it's one more way of saying you don't have to do anything else. You don't have to do anything else, including making any more contributions to the plan. You can make that argument, but you'll never know what the party's true intent was until you start taking the depositions of the people who were responsible for the document. Or one can look at the document itself and draw some logical conclusions. You could, but the only thing I would point out to you finally is look at the trust, because the trust has a separate set of obligations in it. I do want you to do that. And then if Judge Slobodur and Judge Ambrose will indulge me, I have two questions, even though your light's on. You're indulged. Thank you. First is, you're not contending, are you, that this release is something less than knowing involuntary? I'm sorry, Your Honor. You're not contending that the release is less than knowing involuntary, are you? This is a knowing involuntary release, correct? I am contending it in respect to a release of the trust corpus that existed as of that time, because it's alleged on the face of the complaint that the intent of the parties was to accept out the trust corpus and only release the future. Your argument is that I didn't release that at all. That's your argument. Other than that, it is a knowing involuntary release. Well, let's frame it this way when you say other than that. You're saying that's not included in the release at all, right? That's your pitch. And it was never intended to be, yes. But as to what the release does do, whatever it does, it was knowingly and voluntarily entered by your client, correct? Yes. Okay. Now, as to the trust itself, Mr. Hangley pointed us at page 837 of the joint appendix and specifically to subsection 1D of the trust and quoted this language about the plan participant and his beneficiary having no preferred claim on or any beneficial ownership interest in any assets of the trust. Do you want to respond to his argument that that makes it clear, Isabel, that whatever Mr. Caldini had, it was not a claim on what was in that pot? Well, the previous line and then the following page, for example, when it says the principle of the trust and any earnings thereon shall be held separate and apart from the other funds of the company and shall be used exclusively for the purposes of the plan participant and general creditors if they exist, which didn't happen here. And then you get the next page, the very next page in the middle of 2A on A38, it says except as otherwise provided herein, the trustee shall make payments to the plan participant and his beneficiary in accordance with the payment schedule, which was provided by the company. There's something for everyone in these documents. Isn't that consistent with the assertion in the plan itself, which is we've got a trust. It represents a sum of money, which someday we would be paying to you, but you don't have any claim on that particular money. You've got, in effect, an unfunded claim against us. And whatever you have, you don't, it says in paragraph 15 of the supplemental plan, you've got no ownership in that pot of money, and in 1D it says you've got no beneficial interest or preferred claim on any asset of the trust. What is wrong with reading those things consistently with what the district court said, which is, in effect, you had some claim to money, but it wasn't that money. The money in the trust was never your money. It was a claim of a sum equivalent. I know that the plan says, for example, as well, that the plan, that the company can pay out of its own funds the fair value of the money in the trust directly to the plan participant. I don't know how you line that up and fail to find an ambiguity when it says that the principle of the trust shall be held separate and apart from the funds of the company and shall be used exclusively for the use and purpose of the plan participant, exclusively for Mr. Calvitti. Well, it didn't say for Mr. Calvitti. And general creditors. And general creditors. But not the company. But a purpose, a purpose is to measure the amount of money, right? No, I don't buy into that at all. That's not what the trust says. It is what the plan says in some respects. It's not what the trust document says. And the problem here is, as I know I've said, and I'll just repeat one more time, there's something for anyone in these documents. And that's the problem. Thank you very much. We'll take the matter under advisement.